UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ALFRED LAVOIE : | |
|     Plaintiff, : | |
| : | |
|     v. : | Civil No.  3:07-CV-1396 (PCD) |
| : | |
| UNITED STATES OF AMERICA : | |
|     Defendant. : | |

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Alfred Lavoie, brings this action alleging Intentional Infliction of Emotional Distress and Negligent Infliction of Emotional Distress. On October 15, 2008, the Defendant, United States of America, moved pursuant to Rule 56 of the Federal Rules of Civil Procedure for Summary Judgment as to both claims [Doc. No. 30]. On November 2, 2008, Plaintiff opposed this motion [Doc. No. 31]. For the reasons stated herein, Defendant's motion for Summary Judgment [Doc. No. 30] is **GRANTED**.

**I.     Background**

At the summary judgment stage, the Court views the record in the light most favorable to Plaintiff, as the non-moving party. See Terry v. Ashcroft, 336 F.3d 128, 139 (2d Cir. 2003). Plaintiff Alfred Lavoie is an adult male residing in the State of Connecticut. (Compl. ¶ 3; Pl.'s Rule 56(a)(2) Stmt. ¶ 1.) Plaintiff was employed by Pratt & Whitney's Connecticut Aeronautical Nuclear Engine Laboratory ("CANEL") in Middletown, Connecticut from 1958 through 1964.[1] (Pl.'s Rule 56(a)(2) Stmt. ¶ 2.) At CANEL, Plaintiff worked in the heat treating and plating

---

[1] Plaintiff's Complaint stated that Plaintiff worked at CANEL until 1966. (Compl. ¶¶ 7-8.) However, Plaintiff stated in his deposition (Ex. D. 6, 20.) and in Plaintiff's Rule 56(a)(2) Statement of Material Facts (Pl.'s Rule 56(a)(2) Stmt. ¶ 2.) that he worked at CANEL until 1964. For the purposes of this opinion, the year 1964 will be used.

department approximately 40 hours per week and occasionally worked overtime. (Id.) Plaintiff was diagnosed with Stage III Left Cervical Node Hodgkins Disease on March 1, 1988. (Compl. ¶ 8.) Plaintiff alleged that he developed Hodgkin's disease as a result of exposure to radiation while employed at CANEL. (Id.)

On October 30, 2000, Congress enacted the Energy Employees Occupational Illness Compensation Program Act ("EEOICPA"). (Compl. ¶ 5.) Part B of the EEOICPA states that "covered" employees or their survivors can receive a lump sum payment of $150,000.00 and medical benefits. 42 U.S.C. § 7384s. An individual with cancer is "covered," and therefore eligible for EEOICPA benefits, if he meets three requirements: (1) has contracted a cancer, (2) "in the performance of duty," (3) at a DOE or atomic energy employee's facility. See 42 U.S.C. § 7384l(9)(B); 42 U.S.C. § 7384n(b).

When an individual files the appropriate EEOICPA claim forms with the Department of Labor ("DOL") Office of Workers' Compensation Programs ("OWCP"), the DOL begins the process to determine if the claimant is "covered." (Def.'s Rule 56(a)(1) Stmt. ¶ 3.) The DOL verifies that the claimant has cancer, through medical documentation submitted by the claimant, and also verifies the claimant's employment history to determine whether the claimant worked at a DOE or atomic weapons employer's facility before contracting cancer. See 42 U.S.C. § 7384l(9)(B) (limiting the definition of "covered employees with cancer" to members of the Special Exposure Cohort, DOE employees and contractors who contracted cancer after beginning employment at a DOE facility, and atomic weapons employees who contracted cancer after beginning employment at an atomic weapons employer); see Ex. 8 (stating that the EEOCIPA claim procedure begins when the DOL verifies the energy employee's employment at a DOE or

DOE contractor's facility).

The DOL then forwards claims to the National Institute for Occupational Safety and Health's ("NIOSH") Office of Compensation Analysis and Support ("OCAS"), which is located within the Department of Health. (Def.'s Rule 56(a)(1) Stmt. ¶ 3.) OCAS develops scientific guidelines for determining whether a worker's cancer is related to occupational exposure to radiation, develops methods to estimate a worker's occupational exposure to radiation, creates an estimate of the radiation dose the worker may have been exposed to, and establishes a process to classify workers for inclusion into a Special Exposure Cohort. (Id.) Estimating the amount of radiation a claimant was exposed to while working at a DOE or atomic weapon employer's facility is called dose reconstruction.

Dose reconstruction ultimately determines whether the claimant contracted cancer "in the performance of duty" at a DOE or atomic weapon employer's facility. See 42 U.S.C. § 7384l(9)(B)(i) ("The term 'covered employee with cancer' means...[a]n individual with cancer...if and only if that individual is determined to have sustained that cancer in the performance of duty"). "An individual with cancer...shall be determined to have sustained that cancer in the performance of duty for purposes of the compensation program if, and only if, the cancer...was at least as likely as not related to employment at the facility." 42 U.S.C. § 7384n(b).

NIOSH sends a completed dose reconstruction report to the DOL. Harger v. U.S. Dept. of Labor, 2007 WL 1430214 at *2 (E. D. Wash. 2007). The DOL then enters "the dose reconstruction into NIOSH-IREP, a special computer program designed to calculate the Probability of Causation that the cancer was caused by the employee's employment." Id. If the probability indicates that the cancer "was at least as likely as not related to employment at the

facility" then the employee will be a "covered" employee under the EEOICPA. Id.

On July 31, 2001, the EEOICPA went into effect and the DOL began accepting claims. (Def.'s Rule 56(a)(1) Stmt. ¶¶ 1.) The DOL began forwarding claims to NIOSH for dose reconstruction in October 2001. (Ex. A ¶ 5.) From October 2001 to July 2008, NIOSH received over 27,600 claims. (Id.) NIOSH began performing dose reconstructions in the middle of 2002. (Id. at ¶ 4.) Currently, NIOSH has completed dose reconstructions for approximately 24,482 of the claims it has received. (Id. at ¶ 5.)

Plaintiff learned of the EEOICPA compensation program in January 2001 from an article in the Hartford Courant. (Pl.'s Rule 56(a)(2) Stmt. ¶ 7; Ex. 1.) The article generally described the program and indicated that former CANEL employees may be eligible for compensation under the EEOICPA program because the DOE listed CANEL as a facility in Connecticut that handled radioactive material for the U.S. government during the Cold War. (Id.) Additionally, the article contained several statements by Former Energy Secretary Bill Richardson describing the EEOICPA program, including: "[t]he burden of proof is on the government, not the worker," "[w]e will be open and candid this time, not like the past," [w]e failed to take care of workers that got sick from exposure," and finally, that it is time "to settle the score with our workers." (Ex. 1; see Pl.'s Rule 56(a)(2) Stmt. ¶ 8.) Plaintiff attended a meeting in Hartford, Connecticut explaining the EEOICPA compensation program. (Pl.'s Rule 56(a)(2) Stmt. ¶ 9.) Plaintiff alleges that two representatives from NIOSH "expressly assured him that his Hodgkins Disease was a cancer covered by the program and that if he had worked at CANEL he was entitled to compensation." (Id.)

Plaintiff immediately contacted the DOE about the EEOCIPA program and in response,

the DOE furnished him with preliminary information on March 5, 2001. (Pl.'s Rule 56(a)(2) Stmt. ¶ 10; Ex. 2.) Plaintiff filed a claim with the DOL on July 31, 2001, the first effective date of the EEOICPA. (Def.'s Rule 56(a)(1) Stmt. ¶ 6; Pl.'s Rule 56(a)(2) Stmt. ¶ 11.)

Plaintiff received a letter from the DOL on August 21, 2001, indicating that Hodgkin's disease is not a compensable condition under the EEOICPA and the employment information Plaintiff provided would be forwarded to the DOE for verification. (Ex. 3.) However, Plaintiff received a follow-up letter from the DOL dated October 22, 2001 retracting the previous letter, indicating that Hodgkin's disease is a covered condition under the EEOICPA, and requesting supplemental medical information. (Ex. F.)

Plaintiff next received a letter from the DOL on September 11, 2002. (Ex. E.)  It informed Plaintiff that the DOL needed no further information from him and that the next step in his claim process was for NIOSH to perform a dose reconstruction. (Id.) The letter indicated "that the process of dose reconstruction can be time consuming because it relies on information that must be collected from a number of sources," that "NIOSH's primary concern will be to ensure that collected information is valid and that the assumptions used to estimate doses are fair, consistent, and well grounded in the best science," and that "NIOSH estimates that it may take up to six months to complete a dose reconstruction for claims with complex work histories." (Id.)

Plaintiff received a letter from NIOSH on October 3, 2002, indicating that NIOSH had received his claim from the DOL and would begin reconstructing and estimating the approximate dose of radiation Plaintiff received while working at CANEL. (Ex. C.) The letter also included a NIOSH claim tracking number and a warning that "it may take us [NIOSH] several months to obtain the information required to complete the dose reconstruction for your claim." (Id.) Like

the previous letter, NIOSH made Plaintiff aware that the amount of effort involved in a dose reconstruction can vary depending on numerous factors involved in each individual's claim. (Id.)

Following receipt of the NIOSH tracking number, Plaintiff received three letters from NIOSH, dated August 5, 2003, October 14, 2003, and October 2003, updating him on the status of his claim. (See Ex. 4-6.) In the winter of 2003, Senator Christopher Dodd requested that the DOL provide Plaintiff information regarding the status of his claim. (See Ex. G.) Peter Turcic, Director of the Division of Energy Employees Occupational Illness Compensation, responded to Senator Dodd in a letter dated December 12, 2003, stating that "[t]he time and complexity involved in completing an individual dose reconstruction will vary depending on the employment history, exposure and environmental records available to NIOSH." (Id.) Mr. Tucic stated that he would forward Senator Dodd's letter and concerns to NIOSH. (Id.) John Howard, M.D., Director of NIOSH, replied to Senator Dodd on January 21, 2004, claiming that "the amount of effort required to complete a dose reconstruction varies depending on the quality and completeness of the exposure information we [NIOSH] obtain and the complexity of the employee's work history, it is difficult to estimate how much time may be required in any individual case." (Ex. 8.) However, NIOSH did assure Senator Dodd that it was "working diligently on behalf of all claimants to achieve a timely decision on all claims." (Id.)

Plaintiff received a status report from NIOSH in January 2004. (Ex. 7.) Plaintiff then received a letter and questionnaire from the dose reconstruction specialists working for NIOSH on March 26, 2004. (Ex. 9.) The letter informed Plaintiff than an interview aids the dose reconstruction process. (Id.) On April 9, 2004, Plaintiff completed this phone interview. (Id.) Between April 2004 and July 2006, Plaintiff received 8 updates from NIOSH. (Ex. 10-17.)

In October 2006, Senator Dodd again intervened on Plaintiff's behalf. (Ex. 18.) Ms. Julie Louise Gerberding, M.D., M.P.H., Director Centers for Disease Control and Prevention, Department of Heath and Human Services, replied to Senator Dodd. (Id.) She explained that in October 2005 a contract was awarded to evaluate radiological conditions at multiple EEOICPA sites, including CANEL. (Id.) She stated that this contract allowed "worksites with fewer claims to be evaluated so that dose reconstructions may be completed." (Id.) She then stated that once CANEL had been evaluated by the contractors and relevant radiological data had been obtained, Plaintiff would be notified regarding the status of dose reconstruction for his claim. (Id.)

On February 8, 2007, Plaintiff filed an administrative claim against DOE and HHS alleging that his claim has not been processed in a timely manner, causing emotional distress. (Def.'s Rule 56(a)(1) Stmt. ¶ 12; Compl. ¶ 4.) Defendant did not respond to the administrative claim within six months of receipt. (Compl. ¶ 4.) On September 17, 2007, Plaintiff filed this complaint under the Federal Tort Claims Act. (Def.'s Rule 56(a)(1) Stmt. ¶ 15.)

Defendant Answered on February 8, 2008. (Def.'s Rule 56(a)(1) Stmt. ¶ 20.) On April 23, 2008, this Court granted Plaintiff's Motion to Compel Defendant to complete its full processing of Plaintiff's claim by June 2, 2008. (See Order dated April 23, 2008.) NIOSH mailed Plaintiff a letter on May 15, 2008, indicating that sufficient information had been gathered to begin dose reconstruction. (Ex. K; Def.'s Rule 56(a)(1) Stmt. ¶ 22.) On May 21, 2008, NIOSH sent Plaintiff a letter indicating that it had completed dose reconstruction for his claim. (Ex. H; Def.'s Rule 56(a)(1) Stmt. ¶ 22.) On May 28, 2008, Defendant submitted a status report to the Court requesting an additional 60 days to process Plaintiff's claim. (See Order dated May 30, 2008.) This Court initially ordered Defendant to complete processing of Plaintiff's claim by June 16,

7

2008, subsequently extended to June 30, 2008. (Def.'s Rule 56(a)(1) Stmt. ¶ 23.) On June 20, 2008, the DOL wrote to Plaintiff, informing him that NIOSH had improperly completed Plaintiff's dose reconstruction and therefore it had to return the claim to NIOSH for revision. (Ex. 19.) After an internal review, on June 30, 2008, the DOL recommended denying Plaintiff's EEOICPA claim. (Ex. B.) Plaintiff appealed the DOL's recommended decision to the Final Adjudication Branch . (Ex. 20-21).

**II.     Standard of Review**

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c). No genuine issue of material fact exists and summary judgment is therefore appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A material fact is one which "might affect the outcome of the suit under the governing law," and an issue is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). However, "[c]onclusory allegations will not suffice to create a genuine issue." Delaware & H.R. Co. v. Conrail, 902 F.2d 174, 178 (2d Cir. 1990). The moving party bears the burden of establishing that summary judgment is appropriate. Anderson, 477 U.S. at 225. "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on the plaintiff's part, and, at that

point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001), quoting Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

In determining whether a genuine issue has been raised, all ambiguities are resolved and all reasonable inferences are drawn against the moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir. 1980). Determinations of the weight to accord evidence or assessments of the credibility of witnesses are improper on a motion for summary judgment as such are within the sole province of the jury. Hayes v. New York City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996). "If reasonable minds could differ as to the import of the evidence . . . and if . . . there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997) (internal citations omitted); see also Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000) ("When reasonable persons applying the proper legal standards could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury").

**III.   Discussion**

    **A.   Negligent Infliction of Emotional Distress**

To succeed on a claim for negligent infliction of emotional distress Plaintiff must show: "(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough

that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of plaintiff's distress." Ordon v. Karpie, 273 Fed. Appx. 27, 29 (2d Cir. 2008), quoting Carrol v. Allstate Ins. Co., 262 Conn. 433, 444 (Conn. 2003); e.g., Murphy v. Lord Thompson Manor, Inc., 105 Conn. App. 546, 552 (Conn. App. Ct. 2008). The Connecticut Supreme Court has alternatively stated that "in order to prevail on a claim of negligent infliction of emotional distress, the plaintiff must prove that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm." McNamara v. Tournament Players Club of Connecticut, Inc., 270 Conn. 179, 197 (Conn. 2004); accord Carrol, 262 Conn. at 446.

The Connecticut Supreme Court has explained that a successful negligent infliction of emotional distress claim requires:

> [T]hat the fear or distress experienced by the plaintiffs be reasonable in light of the conduct of the defendants. If such a fear were reasonable in light of the defendants' conduct, the defendants should have realized that their conduct created an unreasonable risk of causing distress, and they, therefore, properly would be held liable. Conversely, if the fear were unreasonable in light of the defendants' conduct, the defendants would not have recognized that their conduct could cause this distress and, therefore, they would not be liable.

Carrol, 262 Conn. at 447. See also Larobina v. McDonald, 274 Conn. 394, 410 (Conn. 2005); Barrett v. Danbury Hospital, 232 Conn. 242, 261 (Conn. 1995). A plaintiff does not need to prove that defendant's conduct was extreme and outrageous. Storm v. ITW Insert Molded Prod., 470 F. Supp. 2d 117, 126 n.2 (D. Conn. 2007).

Plaintiff bases his negligent infliction of emotion distress claim on the length of time Defendant took to complete processing of his claim in light of Defendant's statements about the EEOICPA program, his physical state at the time his EEOICPA claim was being processed, and

high level government officials knowledge of the stagnant state of his claim. (Pl.'s Memo. in Opp. to Summ. Judg. at 10-12; Compl. ¶ 13.) The documents submitted by the parties demonstrate that it took Defendant approximately seven years to produce a recommended decision on the merits of Plaintiff's EEOICPA claim. (Def.'s Rule 56(a)(1) Stmt. ¶ 24; Ex. B.) Plaintiff further argues that Defendant was aware that the Plaintiff had Hodgkin's Disease at the time of the origination of Plaintiff's EEOICPA claim and throughout the claim processing period. (Pl.'s Memo. in Opp. to Summ. Judg. at 10.) Additionally, Plaintiff cites to statements by Former Secretary of Energy Bill Richardson and other unknown NIOSH representatives, made before Plaintiff had filed his claim, that had allegedly "explicitly promised" or "expressly assured" him that his claim would be compensated. (Id. at 10.) Finally, Plaintiff relies upon the fact that during the claim processing period multiple high level government officials became aware of the stagnancy of his claim and did nothing to aid the processing of his claim. (Id. at 11.)

Prong one of a negligent infliction of emotion distress claim requires that Plaintiff show that "the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress." Ordon, 273 Fed. Appx. at 29. This generally requires "that the actor's conduct be unreasonable." Olson v. Bristol-Burlington Health Dist., 87 Conn. App. 1, 7 (Conn. App. Ct. 2005). Courts have not found conduct unreasonable where a defendant has fairly performed the tasks it is assigned. See, e.g., Scott v. Town of Monroe, 306 F. Supp. 2d 191, 199 (D. Conn. 2004) (dismissing plaintiff's negligent infliction of emotional distress claim in part because town defendants merely utilized their constitutional authority to change the town border); Craig v. Colonial Penn Ins. Co., 335 F. Supp. 2d 296, 310-11 (D. Conn. 2004) (granting defendant's motion for summary judgement on plaintiff's negligent infliction of emotional distress claim

because defendant had reasonable grounds to deny plaintiff's insurance claim and plaintiff failed to specify why defendant's investigation was unfair).

Here, even viewing the record in the light most favorable to Plaintiff as the non-moving party, see Terry v. Ashcroft, 336 F.3d 128, 139 (2d Cir. 2003), Plaintiff has not set forth evidence from which a jury could reasonably conclude that Defendant's conduct created an unreasonable risk of causing Plaintiff's distress. Defendant's conduct during the claims processing period was entirely reasonable considering the complexity and size of the new compensation program.

Throughout the EEOICPA processing period, Defendant provided Plaintiff with numerous notices and updates. These communications placed the Plaintiff on notice of the enormity and complexity of the project Defendant undertook in establishing the EEOICPA program. Many of the updates contained a section detailing the number of claims received and other major events and facts of the EEOICPA program. (See, e.g., Ex. 2; Ex. 6, Ex. 7, Ex. 10.) From the date Plaintiff originally filed a claim for EEOICPA benefits until the initiation of this lawsuit, Plaintiff received approximately 17 communications from the myriad institutions running the EEOICPA program for Defendant. (See supra Background, Section I.) This does not include the additional communications Plaintiff had with Defendant through Senator Dodd nor any communications following the commencement of this lawsuit in 2007.

The language and content of the notices additionally support the reasonableness of Defendant's conduct. Without exception, Defendant's communications with Plaintiff have been cordial and informative. The notices informed Plaintiff of major milestones in the EEOICPA program, as well as the steps taken towards resolving Plaintiff's individual claim. (E.g., Ex. 3; Ex. 6; Ex. 7; Ex. 10.) Although it is unfortunate that it took seven years for to process Plaintiff's

EEOICPA claim, the notices often informed Plaintiff that dose reconstruction would be complex and time consuming. (E.g., Ex. 5 (stating "thank you for your patience during the start-up phase of our program. Establishing the foundation for conducting dose reconstructions as required under the Energy Employees Occupational Illness Compensation Program Act (EEOICPA) has been an important and busy time for our office"); Ex. 6 (stating that "For AWE [atomic weapons employers] facilities that are no longer in operation, employee and site exposure records may be stored in various storage locations across the country. We are currently conducting data search and recovery efforts at various locations."); Ex. E (stating "that the process of dose reconstruction can be time consuming because it relies on information that must be collected from a number of sources."); Ex. C (stating that the amount of effort and time needed to complete a dose reconstruction depends on the complexity of the claim and the amount of information available.)) The notices warned Plaintiff that dose reconstruction and claim processing in general would be time consuming. The notices served as an apparent attempt to ameliorate claimant concerns over the lengthy time periods required for processing.

Finally, Defendant's prioritization of EEOICPA claims appears reasonable. Defendant stated that it prioritized claims in order to resolve the largest number of claims in light of limited resources, the number of claims, and the complexity of obtaining decades old radiation dose information. (Ex. A ¶ 6.) There is no indication that there were any more reasonable alternatives to efficiently resolving the large numbers of EEOICPA claims. Plaintiff has failed to show that in light of Defendant's assigned tasks, Defendant proceeded in a negligent fashion.

The record shows that Defendant took precautions against causing EEOCIPA claimants distress during the processing period and performed its claim processing duty adequately. The

Defendant's conduct was entirely reasonable and cannot be said to have created an unreasonable risk of causing the plaintiff emotional distress. Accordingly, Defendant's motion for summary judgment is **granted** as to Plaintiff's claim for negligent infliction of emotional distress.

### B.     Intentional Infliction of Emotional Distress

To succeed on a claim of intentional infliction of emotional distress Plaintiff must show: "(1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." Carrol v. Allstate Ins. Co., 262 Conn. 433, 443 (Conn. 2003), quoting Appleton v. Bd. of Ed. of Town of Stonington, 254 Conn. 205, 210 (Conn. 2000) (internal quotation marks omitted). The essential element of the claim is whether the alleged conduct is considered "extreme and outrageous" according to the standards of a civilized community. "Whether defendants' conduct was sufficiently 'extreme and outrageous' is initially a question for the court to decide." Crocco v. Advance Stores Co., 421 F. Supp. 2d 485, 503 (D. Conn. 2006).

Federal courts in the District of Connecticut, applying Connecticut law, "have interpreted the qualification of extreme and outrageous conduct strictly." Hamilton v. Town of Hamden, 2008 WL 4999301 at *10 (D. Conn. 2008), citing Golnik v. Amato, 299 F. Supp. 2d 8, 15 (D. Conn. 2003). "[O]nly where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community" will the second prong of the case for intentional

infliction of emotional distress be satisfied. Carrol, 262 Conn. at 443, quoting Appleton, 254 Conn. at 211. "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" Id. "Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." Id.

Plaintiff's intentional infliction of emotional distress claim rests on essentially the same grounds as Plaintiff's negligent infliction of emotional distress claim, but Plaintiff places greater reliance on the fact that U.S. government officials at the "highest levels" had knowledge of the stagnant status of Plaintiff's EEOICPA claim. (Pl.'s Memo. in Opp. to Summ. Judg. at 12-13; Compl. ¶ 14.) Plaintiff claims that because officials at the highest levels had knowledge of Plaintiff's claim and it took seven years for the claim to be resolved, Defendant acted recklessly and with deliberate indifference. (Id.) The record indicates that U.S. Senator Christopher Dodd; Peter Turcic, the Director of the Division of Energy Employees Occupational Illness Compensation located within OCAS; Larry Elliott, Director of OCAS, located within the DOL; John Howard, M.D., Director of NIOSH; and Ms. Julie Louise Gerberding, M.D., M.P.H., Director of the Centers for Disease Control and Prevention, Department of Heath and Human Services had knowledge of the status of Plaintiff's claim. (Ex. G; Ex. 8; Ex. 18.)

Defendant's conduct in processing Plaintiff's EEOICPA claim does not rise to the level of "extreme and outrageous" behavior. Defendant's conduct falls far below conduct that courts have found insufficient to constitute "extreme and outrageous" behavior. See Davis v. Davis, 112 Conn. App. 56, 58-67 (Conn. App. Ct. 2009) (failing to find extreme and outrageous conduct

where defendants made repeated angry and hostile threats to plaintiff and used plaintiff's son in a ruse to gain access to the marital residence in order to change the locks forcing plaintiff to call the police to regain entry to the marital residence, even in light of defendant's knowledge that plaintiff had been treated for depression and recently under gone four major surgeries); Carrol v. Allstate Ins. Co., 262 Conn. 433, 438-44 (Conn. 2003) (failing to find extreme and outrageous behavior where defendant falsely concluded that fire at plaintiff's home was arson and conclusion was based on inadequate and non-neutral investigation); Appleton v. Bd. of Ed. of Town of Stonington, 254 Conn. 205, 211-12 (Conn. 2000) (failing to find extreme and outrageous behavior for condescending and humiliating remarks); Carnemolla v. Walsh, 75 Conn. App. 319, 331-32, cert. denied, 263 Conn. 913 (Conn. 2003) (failing to find extreme and outrageous behavior for the false accusation of criminal conduct); Dollard v. Bd. of Educ, 63 Conn. App. 550, 552-53 (Conn. App. Ct. 2001) (failing to find extreme and outrageous behavior for public admonishment); Orellana v. Chiera, 2008 WL 4779738 at *5 (Conn. Super. Ct. 2008) (failing to find extreme and outrageous behavior for allegations that misrepresentations made by the defendant during the course of a real estate purchase and subsequent construction lead to emotional and financial strain to maintain the mortgages). In addition to the discussion of the reasonableness of Defendant's conduct noted above, it is simply not "extreme and outrageous" behavior for the government to prioritize certain claims for processing or for an extended period of time to pass while the government collects and analyzes large amounts of decades old radiation dose information.

      Nor does Plaintiff's claim become "extreme and outrageous" because high government officials were made aware of Plaintiff's EEOICPA claim over the claim's seven year processing

period. Government officials acknowledged that "the amount of effort required to complete a dose reconstruction varies depending on the quality and completeness of the exposure information." (E.g., Ex. 8.) There is no indication in the record of intent to delay or hinder processing of Plaintiff's claim. In fact, the correspondence in the record demonstrates that government officials shared Plaintiff's concerns and sought to resolve the processing issues. For example, Peter Turcic, Director of the Division of Energy Employees Occupational Illness Compensation, stated that "[b]ecause of the fact that Mr. Lavoie's concern is related to the current status of his claim, I am forwarding your inquiry along with Mr. Lavoie's letter to Mr. Larry Elliot" Director of OCAS. (Ex. G.) Additionally, the high government officials took the time and effort necessary to obtain Plaintiff's information and directly respond to Senator Dodd. The mere fact that many high government officials were aware of Plaintiff's claim, which ultimately took seven years to process, would not make an average member of the community exclaim "outrageous."

Cases outside of this jurisdiction have similarly refused to find a delay in processing insufficient for a claim of intentional infliction of emotional distress. See e.g., Piper v. American Nat. Life Ins. Co. of Texas, 228 F. Supp. 2d 553, 563-64 (M.D. Pa. 2002) (dismissing intentional infliction of emotional distress claim where the plaintiff alleged that the delay in processing the an insurance application was extreme and outrageous, which caused emotional distress that contributed to plaintiff medical conditions, because the "delay in processing an application does not approach the high bar" for extreme and outrageous conduct).

The delay in processing Plaintiff's claim, when government officials at the "highest levels" were aware of its existence and procedural history, may have upset Plaintiff. (See Ex. D

at 24 (Plaintiff stated in his deposition that "I feel what anyone else would feel, a big let down. My government let me down."); Pl.'s Answer to Def's Interrogs. ¶ 12 ("[I]t is very depressing and upsetting to realize that this is the way my government treats those of us who always have tried to be good and loyal Americans.")) However, "[c]onduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." Carrol, 262 Conn. at 443, quoting Appleton, 254 Conn. at 211. Accordingly, Defendant's motion for summary judgment is **granted** as to Plaintiff's claim for intentional infliction of emotional distress.

## IV.     Conclusion

For the reasons stated herein, Defendant's motion for summary judgment [Doc. No. 30] is **GRANTED**.  The Clerk is directed to close the case.

SO ORDERED.

Dated at New Haven, Connecticut, May  4, 2009.

/s/

Peter C. Dorsey, U.S.D.J.